Hoffman, J.
The material question in the case is, whether any agreement for a transfer of the risk to the goods of the store in Grand-street, other than an agreement in writing, could be binding upon the company.
It must be conceded that there could not be any valid original agreement to insure, by parol, to bind this company, however definite and however well proven. The case in the Court of Appeals of The Baptist Church v. The Brooklyn Insurance Co. settles definitely that a corporation authorized to make insurances in writing, cannot make them in any other manner. The opinion of Chief-Justice Marshall in Head v. The Providence Insurance Co., (2 Cranch, 127,) is cited and relied upon. “ The act of incorporation is to the corporation an enabling act. It gives them all the powers they possess. It enables them to contract, and when it prescribes to them a mode of contracting they must observe that mode, or the instrument no more creates a contract than if the body had never been incorporated.”
Mr. Justice Gardiner quotes the charter of the Brooklyn company as providing, “ that policies of insurance and other contracts founded thereon, shall be in writing, signed by the president, and countersigned by the secretary.” It at first struck me that the charter of the present company was not so explicit or decisive as to the necessity of a writing as that of the Brooklyn company. The Acts of Incorporation are not referred to in the opinion; but we find them in the laws of 1824, ch. 166, in the laws of 1829, ch. 131, and in those of 1844, ch. 133. The provisions in the two last acts do hot bear upon the present question.
By the 2d section of the act of 1824, the company had power to make contracts of insurance with any person against loss or damage by fire of-houses, merchandise, etc., and there was no prescription of their being in writing. By the 10th section, however, policies of insurance, and other contracts founded thereon, though *11 not under seal, if subscribed by the president, (or, in certain cases, by another designated person,) and countersigned by the secretary, shall be binding and obligatory upon the corporation.
The present defendants were incorporated under the general act of April 10th, 1849. By the 3d section of that act, the persons proposing to associate themselves were to file a copy of the charter proposed to be adopted by them, and by the 10th section, it was made the duty of the corporators to declare in such charter (among other things) the mode and manner in which the corporate powers given under such general act are to be exercised.
Accordingly, the present defendants adopted and declared a charter, and by its 10th section they provided, “that the president, or other person appointed by the board of directors for that purpose, shall be authorized in the name, and on behalf of, the company to make contracts of insurance with any person or persons against loss or damage upon any property on which this company may lawfully make insurance. The policies issued pursuant to such contract of insurance shall be signed by the president, and countersigned by the secretary of the company, or the same may be signed and countersigned by such other person or persons as a majority of the directors may appoint for that purpose; such policies shall be binding and obligatory upon the company in like manner and force as if made under the seal of the company.”
It is deemed useful to refer also to the 11th section of the general act of April 10th, 1849, under which this company was organized. (Sess. Laws, ch. 308.)
My conclusion is, that no parol contract, and no written contract, however plainly made or adopted by directors or officers for an original policy of insurance, can be binding, unless it has received the signature of the president, secretary, or the other persons formally designated by a majority of the directors. Thus, the grave question of the possibility of enforcing a parol contract to insure will be found wholly inapplicable to the great body of the fire insurance companies of our state. See 1 Duer on Insurance, p. 61, and note 2, p. 100, and the valuable suggestions in Justice Grardiner’s opinion as to the origin of policies being in the civil and not in the common law, as bearing upon the question of the necessity of a writing.
We thus come to the consideration of the true character of the, *12 alleged agreement between the parties as to the continuance of the responsibility of the company after the removal of the goods.
It was not denied by counsel, and does not admit of denial, that between the 1st of February and the 1st of March, 1854, the policy was totally inoperative. Had a loss then occurred, no recovery could have been had. The insurance was upon goods in the store in Avenue D. It wordd have continued in force upon any substituted goods, replacing those disposed of in trade in the same place. It would also have so continued upon the same goods, if temporarily removed and then restored. Hot being replaced or restored, the subject matter of the insurance was gone. The goods no longer existing in the place in which they were covered, there was nothing upon which the policy attached. The case is even stronger than that of Dow v. The Hope Insurance Co. in this court, (1 Hall, 172,) in which merchandise was insured outward, and then proceeds home, and it was held that the policy did not cover the same goods brought back in the vessel.
The policy, then, being inoperative, and the goods uninsured, the parol evidence is to establish that the goods were actually re-insured in their new location. In whatever form the proposition is presented, it really comes to this: goods not covered by an insurance are to be insured by means of a parol agreement made with an officer of the company.
Upon this question, the actual decision in the Baptist Church case, in the Court of Appeals, must be carefully examined. It is reported in the court below, in 18 Barbour, 69. The policy was executed on the 22d of July, 1845, insuring the church building against fire for one year. The policy was not delivered until some time after, and the premium was not paid until the 21st of February, 1846. The president of the company subsequently made an arrangement with the treasurer of the church, that the policy should be renewed from time to time, without further notice, until one party or the other should give notice of an intention to discontinue the renewal, up to which time it was agreed that the company should renew and give a certificate, the church paying the premium.
The last renewal certificate had been taken to the church after the 22d of July, 1847. The church was burned on the 10th of September, 1848. The renewal certificate which should regularly *13 have been sent about the 22d of July, 1848, had not been sent, nor had the company called for the premium. Justice Mitchell states, as the result of the evidence, that this was an agreement that the risk should be permanent, and the policy continued until either should vacate it, not for one year only, but for several— from year to year. After this it would be a breach of faith in the company to say that the policy should not be deemed in force unless they first gave notice to that effect.
On this state of facts the Supreme Court held the company responsible, and this decision was reversed by the Court of Appeals.
Mr. Justice Gardiner’s opinion involves these important points. That it is extremely doubtful whether a verbal contract to insure can in any case be valid. The bearing of the opinion is decidedly hostile to it. That where the charter of a company prescribes that policies of insurance shall be in writing, signed and countersigned by particular officers, there can be no other mode of binding it.
That a verbal agreement between the officers and another to renew and continue a policy in force, whether made after or before the expiration, is not obligatory. I deduce that payment of the premium would make no difference. Upon the point of a distinction between a contract to make and one to renew a policy, he expresses himself thus: “It is, however, claimed that the contract in question is one to renew or continue an insurance, and is rather an agreement for a policy than a policy itself; but I am unable to see any difference in this respect between an agreement to insure, and one for continuing an agreement of that kind, which would otherwise expire by its own limitation. The new contract is founded upon the original policy which it adopts, and extends its provisions to another and distinct interval of time. It is either a policy of insurance for an indefinite period, or a contract presupposing a policy, and founded thereon, by stipulating for successive renewals. In either case the agreement must be in writing, and executed in the manner prescribed by the charter, in order to bind the corporation.”
In the case of Head v. The Providence Company, (2 Cranch, 105,) relied upon in the Court of Appeals, there was a clause in the charter, “that all policies of insurance and other instruments *14 made and signed by the president of such company, or any other officer thereof, according to the by-laws thereof, shall be good and effectual to bind such company to the performance thereof in manner as set forth in the constitution hereinafter recited.”
The court say: “A contract varying a policy is as much an instrument as the policy itself, and therefore can only be executed in the manner prescribed by law. The force of the. policy might indeed have been terminated by actually cancelling it, but a contract to cancel it is as solemn an act as a contract to make it, and to become the act of the company must be executed according to the forms in which they are enabled to act.”
The Judge at the trial had charged that an agreement to correct the policy in question had been fully proven, and they must find for the defendants. On writ of error the judgment was reversed, for the reasons above stated. These authorities appear to me decisive, and to settle that the company could only have been bound to pay a loss on the goods removed, by a contract in writing, signed by the president and countersigned by the secretary.
Slosson, J.
In the case of the First Baptist Church v. The Brooklyn Fire Insurance Company, (18 Barb. 69,) the Supreme Court for this district decided that a parol agreement that the policy effected by the defendants should be renewed from time to time, without further notice, until one party or the other should give notice of an intention to discontinue; in other words, a parol agreement for a continuous risk, was valid and binding on the company, notwithstanding at the time of the loss the premium for the year had not been paid, nor the certificate of renewal given. The court treated it as an agreement to continue an insurance already effected, or an agreement for a policy, and therefore good, though not in writing, while they agree that a policy itself would not be good unless in writing.
This case was carried up on appeal, and the court of last resort reversed the judgment of the Supreme Court, and held that there was no substantial distinction between an agreement to insure; (a policy,) and one for continuing an insurance which would otherwise expire by its own limitation, and that in either case the agreement must be in writing, and executed in the manner prescribed in the charter, in order to bind the corporation.
*15 The opinion of the court, as delivered by Gardiner, Chief-Justice, is not yet reported, and I was first made acquainted with it on the argument at General Term.
The charter of the Brooklyn Insurance Company provided that policies of insurance, and other contracts founded thereon, should be in writing, signed by the president and countersigned by the secretary.
By the 10th section of the general act of 1849, (Sess. Laws, ch. 308,) providing for the incorporation of insurance companies, and under which the present defendants were organized, it is required of every company organized thereunder to “declare in their charter the mode and manner in which the corporate powers, given under and by virtue of this act, are to be exercised.”
Their charter accordingly provides, (§ 10,) that its officers therein designated, shall be authorized, in behalf of the company, to make contracts of insurance, and that the policies issued pursuant to such contracts of insurance shall be signed by the president and countersigned by the secretary.
In other words, its contracts of insurance must be in writing. It cannot be denied that the policy in the present case was applicable only to goods in the place in which they were insured, and could not be extended to the goods after their removal to Grand-street, except by express agreement of the company, and accordingly such an agreement is alleged in the complaint as the foundation of the action.
The effect of such an agreement would be, to make a new contract of insurance, the place where goods are insured being as much a part of the original contract as the stipulation of insurance itself. “A contract,” says Judge Marshall, “varying a policy, is as much an instrument as the policy itself and therefore can only be executed in the manner prescribed by law.” (Head & Amory v. The Providence Insurance Co., 2 Cranch, p. 168.)
The agreement in the present case, if held to have been proved, was by parol only, and that not express, but by implication from the silence of the officers of the company, coupled with certain acts indicating that the question of extending the policy to the goods in the new place of their deposit had been taken into consideration.
I will not stop to inquire whether these acts were done by any *16 officers authorized to bind the company, since under the decision of the court of appeals, in the case of the Baptist church, no officer could bind the company by a contract of insurance unless in writing; but I must be permitted to say, that I think good faith required of this company that they should have frankly informed the plaintiff' of their intention not to continue the risk, if. such was the resolution to which they had come, and not have left him to repose on the belief that he whs insured, until the catastrophe had happened against which he supposed himself indemnified. It is true both the president and secretary of the company say that the application to transfer the risk was not made to them personally, and that they never consented to any transfer; but they both admit that the policy was lying in the office several months after it had been left for that purpose, and the secretary says “it was left for the purpose of having the risk transferred,” and the president says, that after the fire it was laid before the loss committee. When the policy was left, on the 1st of March, it was entered by the clerk in -a book as a case for survey, and the clerk said he would send a surveyor, when the plaintiff called again, on the 10th of April, for his policy, the clerk told him he need not call again, it would be sent to him. The plaintiff again sent for it, but did not get it. After the fire the president told him it was of no use to him.
About a week after the policy had been left at the company’s office, a person did call to survey the premises to which the goods had been removed, and was identified by the witness as the same person who had surveyed the premises in Avenue D, where the goods were originally insured, yet the president says no survey was ever made to his -knowledge—the surveyor himself was not put on the stand.
I advert to these features of the case, not as affecting the legal rights of the parties, but as showing an absence of that extreme good faith on the part of- this company, or, to say the least, a want of that prudent and careful regard for the rights and interests of the plaintiff, which in every instance ought to characterize the transactions of these corporations with their dealers.
I think the decision of the Court of Appeals referred to must be considered as conclusive on the question involved in the present case, and that no written consent to a transfer of risk having *17 been shown, the policy ceased to have any operation, by the removal of the goods from Avenue D to Grand-street, and the defendants are therefore entitled to judgment. (Code, § 265.)
The verdict must therefore be set aside, and the complaint be dismissed with costs.